Jones, Chief Judge,
dissenting:
I am unable to agree with the conclusion reached by the majority.
The case turns on the construction of Article 10 of the contract between plaintiff and defendant, which reads as follows:
Contractor shall supply the water required by the United States for use at the project.
The majority of the court has construed the phrase “the water required” to mean “all the water needed.”
The word “required” is a very flexible term. Its meaning depends largely upon the circumstances surrounding its use and the setting in which it is used. According to Black’s Law Dictionary, 4th Edition, 1951, it is defined as follows:
Require. To direct, order, demand, instruct, command, claim, compare, request, need, exact.
As was stated by the Supreme Court in the case of Merriam v. United States, 107 U. S. 437, 441:
It is a fundamental rule that in the construction of contracts the courts may look not only to the language employed, but to the subject-matter and the surrounding circumstances, and may avail themselves of the. same light which the parties possessed when the contract was made.
*16 In order to so construe a verb that has such a wide variety of meanings as to justify its use as a means of collecting anticipated profits on a mandatory basis would necessitate circumstances that would preclude any other reasonable meaning.
Let us examine the circumstances under which this contract was executed. In early 1942 the War Department planned a defense project near Nashville, Tennessee. The design contemplated water supply requirements of about 1,360,000 gallons per day, or 950 gallons per minute, with 50 percent increased capacity during peak loads. Both the plaintiff and the City of Nashville submitted quotations and the contract was awarded to the city. Notice of the award was carried in two local papers, and it was seen by a representative of the plaintiff.
It had been anticipated that water would first be needed under the contract with the city during September or early October 1942. However, a change in plans necessitated an earlier date for at least partial occupancy in midsummer. It was found that the city could not possibly complete the work involved in its contract, including the construction and installation of a new 16-inch water main so as to provide water at the earlier date. A representative of the defendant then went to the plaintiff to ascertain if it could furnish the water, and a contract was entered into by the terms of which plaintiff agreed to furnish water for 18 cents per hundred cubic feet, the rate to be reduced to 15 cents after a certain minimum had been used.
The plaintiff contends that under these circumstances the defendant was obligated to obtain from it all the water it used not only for the period of construction, but also during operation, to the exclusion of any other source of supply. The defendant contends that it was obligated to take only such amounts as it might elect to take.
In my judgment the facts of this case very much favor the construction placed on the language by the defendant. In the first place, the plaintiff had submitted bids on the original contract to supply the water for the project generally. That contract had been awarded to the City of Nash *17 ville at a lower rate. Plaintiff insists that it did not know of the outstanding contract, nor its terms, although it admitted having seen a newspaper notice of the award.
This was a utility company. I have been inclined to consider people who run utility companies as being somewhat experienced businessmen. Does anyone believe that having submitted quotations for the furnishing of water, and having seen a notice of the awarding of the contract in the paper, plaintiff was still in darkness as to the existence and terms of the city contract? If it did not find out all about those terms its officials were babes in the woods in a business sense, and if thpy were, they had no business going into the woods.
I can reach no other conclusion than that these good businessmen who were operating a successful utilities company knew within 24 hours every provision in the city contract. Then, too, another circumstance tends to bear out the defendant’s construction of the language used in the contract. In order for the plaintiff to supply the water needed for the building of the project it was necessary to have additional plant facilities which the plaintiff was in a position to construct immediately, but according to the contract with the defendant those facilities would cost $28,000. The Government agreed to advance $18,000, thus making it necessary for the plaintiff to furnish only $10,000, which was the estimated scrap value of the additional facilities. The advance was to be gradually recouped by deducting 10 percent from the water bills. If the parties had intended that all of the water that was to be used or needed by the defendant throughout the operation of the project was to be covered by the contract with the plaintiff then certainly it would not have been necessary for the defendant to make an advance payment. The very fact that the Government was willing to make this advance payment tends to indicate at least that it was not certain just how long the plaintiff would be called upon to furnish water to the defendant.
The plaintiff was not taking much chance since regardless of whether much, little, or any water was taken it would have new plant facilities constructed at scrap prices.
*18 Tlie defendant paid for the water which the plaintiff actually furnished and this suit is for anticipated profits on water that was not used by the defendant and was not furnished by the plaintiff, but which the plaintiff contends the defendant was obligated to purchase from it.
The majority opinion cites a great many cases, most of which can be clearly distinguished, and practically all of which recognize the shaded meaning of the word “require” as used in contracts under different circumstances. A number of cases are also cited by the defendant showing the different meaning as the term is used under different circumstances. I quote from the case of Converse v. United States, 69 C. Cls. 670, 679:
It is true that the word “require” is sometimes used as synonymous with the word “need,” but more often the word “require” means to demand, request, or ask of right, and numerous authorities could be cited to show that in similar cases the courts have given it this meaning. [Citing cases.]
I find that the conduct of the parties and the circumstances under which the contract was made negatives the meaning placed upon it by the majority. I believe that the interpretation placed upon it by the parties’ own conduct should govern in the circumstances of this case.
It may be added that it is doubtful whether plaintiff has shown that it was able to furnish all the water which was needed by the project throughout its operation. The plaintiff was furnishing water to a number of other customers and the evidence indicates that it was not equipped to furnish its regular customers and the total amount which the needs of the project would call for.
At any rate, since it appears that the plaintiff entered into this contract fully cognizant of the outstanding contract with the city, and since it knew or should have known that the defendant was contracting to pay it for water at rates 50 percent higher than its contract with the city called for, and since it demanded as a requirement that the defendant advance all the cost of the additional construction except its scrap value, and since early in 1943 in response to a letter of protest by the plaintiff against the defendant’s *19 purchasing water from the city the defendant made clear its interpretation of the contract and offered, if plaintiff was not satisfied with that interpretation, to cancel the contract and plaintiff did not reply to such letter, it is my conclusion that in view of these and the other circumstances of this case, the plaintiff is not entitled to recover against the defendant. I would dismiss the petition.
Judge Whitaker agrees with the foregoing dissent.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Currell Vance, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a municipal corporation, organized under the laws of Tennessee, with its principal place of business in the city of Nashville, Tennessee. Mr. H. C. Sain-don is, and was at all times pertinent hereto, the manager and secretary-treasurer of the plaintiff. Plaintiff is a water utility, sometimes referred to as Radnor Water District.
2. On April 23, 1942, the defendant, through Col. O. E. Walsh, contracting officer, acting for the Corps of Engineers, U. S. Army, entered into a contract with plaintiff for furnishing water for the Berry Hills Air Crew Classification Center, located near the city of Nashville. The contract provided for the installation by plaintiff of certain facilities estimated to cost approximately $28,000, specified in an appendix to the contract. Of this amount of $28,000, plaintiff was to furnish $10,000 and the defendant $18,000, which latter sum was to be recouped by defendant by withholding 10 percent of all bills for water supplied by plaintiff.
3. Pertinent provisions of the contract were as follows:
ARTICLE I
FACILITIES TO BE FROVIDED
1. The Contractor shall proceed to acquire or construct all necessary equipment, materials and rights of way needed for Contractor’s New Facilities, which are described more fully in Appendix “A” attached hereto and made a part hereof.
*20 ARTICLE VI
GENERAL PROVISIONS
* * i’fi * *
3. Disputes. All disputes concerning questions of fact arising under this contract shall be decided by the Contracting Officer subject to written appeal by the Contractor within thirty (30) days to the Chief of Engineers, whose decision shall be final and conclusive upon the parties hereto.
ARTICLE VII
1. This contract shall take effect as of the date of execution thereof and continue until further notice. Notice of intention to terminate this contract shall be at the option of the United States and shall be given in writing by the Contracting Officer to the Contractor not less than ninety (90) days in advance of the effective date of termination.
ARTICLE IX
DESCRIPTION OE FACILITIES TO BE PROVIDED
The facilities to be provided for supplying water under this contract shall be sufficient for furnishing the project 1,500,000 gallons of water per day under a minimum continuous operating pressure of 50 pounds per square inch.
article x
SERVICES TO BE RENDERED
Contractor shall supply the water required by the United States for use at the project.
ARTICLE XXI
RATES
The rates to be paid by the Government to the contractor for water consumed each month under this contract shall be eighteen (18) cents per one hundred (100) cubic feet up to and including one hundred thirty three thousand six hundred and eighty (133,680) cubic feet, and fifteen (15) cents per one hundred (100) cubic feet for all water consumed over one hun *21 dred thirty three thousand six hundred and eighty (133,680) cubic feet.
4. Some 4 or 5 days before the date of plaintiff’s contract, a similar contract had been entered into with the city of Nashville for supplying water to the Berry Hills Air Crew Classification Center. News of the execution of said contract was published at the time in two Nashville daily papers, and those articles were seen by Mr. Saindon.
5. The Government began using water furnished by the plaintiff in July of 1942. It continued to use and pay for water from the plaintiff over a period of years. However, as the city of Nashville facilities were completed, the Government began to take more water from the city and less from the plaintiff until October 1946, when it ceased taking any water from plaintiff, and thereafter took all water needed from the city of Nashville.
By a written notice of June 12, 1947 to plaintiff, the defendant notified plaintiff of the termination of the contract, pursuant to Article VII thereof.
6. The plaintiff protested the action of defendant in taking water from the city of Nashville by letter of March 23, 1943. In response, the Corps of Engineers wrote plaintiff on May 1, 1943, denying liability of the Government to take water in any amount from plaintiff and stating that that office upon receipt of a letter from the plaintiff requesting termination of the contract would consider terminating the contract if it could be shown that losses were being sustained by the plaintiff and that the termination of the contract would not be a detriment to the interests of the Government. The plaintiff did not make a request to the Government that the contract be terminated.
7. Through its attorneys, plaintiff in writing, on October 24, 1947, protested the failure of the Government to take from the plaintiff’s system all the water used at the project during the period of the contract.
8. Thereafter, on May 17, 1948, Robert W. Logan, contracting officer, in writing issued his findings of fact and determination of the claim, which because of its length is not reproduced here. Summarized, the pertinent findings and conclusions of such determination were as follows:
*22 (a) Since the effective date of plaintiff’s contract the project was operated successively by (1) U. S. Engineers (construction), (2) Air Force, (3) Navy, (4) FPHA and (5) Air Force, and that plaintiff received notices of the successive changes in authorities.
(b) The project was still under construction as of April 23,1942.
(c) The first water contract was awarded to the city, the second to plaintiff.
(d) Plaintiff’s contract was to procure the Government’s requirements at the project for construction purposes.
(e) The city’s water pressure, prior to- completion of a booster station at the project, was inadequate for construction purposes. ■
(f) Since December 1942, the need for higher water pressure was reduced as construction neared completion.
(g) Plaintiff’s claim was for lost profits.
(h) Plaintiff knew or should have been on notice that the Government had a prior contract with city and that construction of city’s supply lines was in progress.
9. Plaintiff thereafter appealed to the Chief of Engineers by letter of May 27,1948.
10. The above appeal resulted in further additional findings of fact by the Air Force Contracting Officer, Eobert W. Logan, on October 29,1948, which reaffirmed and elaborated on that officer’s findings of May 17,1948, noted above.
11. The Corps of Engineers Claims and Appeals Board in an opinion approved by the Chief of Engineers October 23, 1949, determined, in summary, that
(a) Plaintiff’s contract was the second one in point of time.
(b) The city contract was for water for the operation of the project' as contrasted with plaintiff’s contract for water for construction of the project.
(c) The city did not have the high pressure necessary for the period of construction.
(d) From January 1943 onward nearly all water was obtained from the city.
(e) The plaintiff knew of the prior contract at the time of the execution of its own contract.
*23 (f) Plaintiff has been paid for all water furnished by it and for all its expenses and has suffered no loss.
12. The design for the Berry Hills Air Crew Classification Center contemplated water requirements of some 1,361,000 gallons per day, or approximately 950 gallons per minute, with 50 percent increased capacity per minute during peak loads, and a fire control capacity of 480,000 gallons over a period of four hours.
13. It had been anticipated by the defendant that water would be first required under the city contract during September or early October of 1942. However, a change in plans for the project set an earlier date for beneficial occupancy of certain high elevation areas, calling for their readiness about the first of July 1942.
14. The plaintiff had been under consideration for the water supply contract noted above, and had submitted quotations thereon, but at rates in excess of those incorporated in the city contract. Notice of the award of the city contract, noted above, was carried in two local newspapers and such notice was seen by Mr. Saindon.
15. It was defendant’s contracting officer’s intention to take all of its water requirements from plaintiff until the city of Nashville was in a position to supply that service, and as the latter facilities became adequate to take more and more water from it until no more water would be taken from plaintiff.
16. It is plaintiff’s contention that the language of Article X of the contract, quoted hereinabove, is plain and unambiguous, and obligated the defendant to take from the plaintiff all its needs of water.
The defendant’s position is twofold. It contends first, that the language of said Article X is ambiguous; that in this situation the circumstances existing at the time of the execution of the contract may be examined, and that such circumstances indicate an intention contrary to plaintiff’s claim.
In the second place, defendant contends that plaintiff was incapable of supplying the daily requirements of its contract, or in fact the water obtained by the defendant from it and from the city of Nashville.
*24 17. Although the defendant’s contracting officer, in entering into plaintiff’s contract, did not intend to bind the defendant to obtain from plaintiff all of its water requirements at the project, the plaintiff was not apprised of that intention, or advised of the requirements for water supply embodied in the design for Berry Hills Air Crew Classification Center, in the matters of peak load, fire control load, or in fact any requirements not embodied in its own contract, or that its water was to be used primarily for construction purposes. On the contrary, plaintiff anticipated supplying under its contract all of defendant’s water needed at the project, and considered that its contract so provided.
Plaintiff’s expectation was shared by defendant’s civilian employees who prepared the contract and presented it to plaintiff for signing. When Mr. Saindon demurred at the investment of $10,000 by plaintiff in new facilities without a knowledge of the duration of the contract, and without a guaranteed service charge, they reassured him by calling attention to the large quantities of water involved.
18. The circumstances surrounding the parties at the execution of plaintiff’s contract, do not reveal conclusively any mutual understanding of the parties as to the proper interpretation of Article X of the contract.
19. As to defendant’s contention that plaintiff’s facilities were inadequate to supply all the water supplied, both by it and by the city of Nashville, at the required pressure per square inch, the testimony is conflicting. The witnesses arrived at their conclusions by the application of certain formulas. Among said formulas is one designated as a “C” factor, which defines the loss of pressure in pipes of various sizes of various ages over various distances. The chief difference between the results arrived at by plaintiff’s and defendant’s witnesses, arises over the proper “C” factor applicable to plaintiff’s facilities.
The new facilities installed by the plaintiff were those specified in Appendix A to the contract, and there is no contention by defendant that said facilities were not installed in conformity therewith. During the entire controversy between the parties, prior to the hearing before the Commissioner of this Court, in this case, there was no contention *25 advanced by the defendant of plaintiff’s inability to perform its obligations under the contract.
20. Whether or not plaintiff could have supplied at the required pressure the minimum of 1,500,000 gallons per day, set out in the contract, it could, at any rate, have supplied at the required pressure all the water supplied by the city of Nashville, plus that supplied by itself.
21. Had plaintiff furnished to the defendant for use at the Berry Hills Air Crew Classification Center all of the water actually furnished by the city of Nashville, its profit thereon would have been the sum of $10,945.73.
CONCLUSION 03? LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States ten thousand nine hundred forty-five dollars and seventy-three cents ($10,945.73).